**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| Terry Wagner (R07282), | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 23 C 50145 |
| v. | ) | |
| | ) | Hon. Iain D. Johnston |
| Wexford Health Source Inc, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff's motion to strike [125] is denied. Defendants' motion for summary judgment [96] is granted. If Plaintiff wishes to appeal, he must file a notice of appeal with this Court within thirty days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1). If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* in this Court. *See* Fed. R. App. P. 24(a)(1). Final judgment shall enter. Civil case closed.

<u>**BACKGROUND**</u>

Plaintiff Terry Wagner, an Illinois state prisoner and frequent litigator in this Court, filed this *pro se* civil rights action under 42 U.S.C. § 1983 in April 2023, alleging violations of his constitutional rights arising out of his medical care and treatment at Dixon Correctional Center ("Dixon"). Specifically, Plaintiff claims that Defendants Dr. Merrill Zahtz ("Zahtz"), Dr. Larry Sy ("Sy"), Dr. Peter Popovich ("Popovich"), and medical records clerk Cassandra Morse (neé Cantu) ("Cantu") were deliberately indifferent to his elevated CPK and LDH levels, his eye/vision issues, and his "excessive burping." Plaintiff also claims that Wexford Health Sources, Inc. ("Wexford") maintained unconstitutional policies or practices that were the cause of the denials/delays with regard to his medical care, and that Defendant Cantu retaliated against him for

filing grievances and letters.

Defendants have moved for summary judgment. Plaintiff responded to Defendants' motion for summary judgment, and Defendants have replied. For the reasons discussed below, the Court grants Defendants' motion for summary judgment.

## I.     Northern District of Illinois Local Rule 56.1

Local Rule 56.1 governs the procedures for filing and responding to motions for summary judgment in this Court. Rule 56.1 requires the party moving for summary judgment to provide a statement of material facts and a supporting memorandum of law. LR 56.1(a)(1), (2) (N.D. Ill.) (amd. Feb. 18, 2021). The statement of material facts "must consist of concise numbered paragraphs[,]" and "[e]ach asserted fact must be supported by citation to the specific evidentiary material, including the specific page number, that supports it." LR 56.1(d)(1),(2). When addressing facts in its memorandum of law, the moving party "must cite directly to specific paragraphs in the LR 56.1 statements or responses." LR 56.1(g).

The party opposing summary judgment must submit a supporting memorandum of law and a response to the moving party's statement of facts. LR 56.1(b)(1),(2). A fact may be admitted, disputed, or admitted in part and disputed in part. LR 56.1(e)(2). To dispute an asserted fact, the opposing party "must cite specific evidentiary material that controverts the fact" and explain "how the cited material controverts the asserted fact." LR 56.1(e)(3). "[M]ere disagreement with the movant's asserted facts is inadequate[.]" *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003). "Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." LR 56.1(e)(3).

Here, Defendants filed a Rule 56.1 statement of material facts with their motion for summary judgment. (Dkt. 98.) Consistent with the Local Rules, Defendants also provided

Plaintiff with a Local Rule 56.2 Notice, which explains what Local Rule 56.1 requires of a litigant opposing summary judgment. (Dkt. 102.)

For his part, Plaintiff submitted a "response" to Defendants' statement of facts. (Dkt. 119.) This document does not clearly indicate whether Plaintiff admits or disputes Defendants' facts and attempts to assert additional facts.[1] Separately, Plaintiff filed a "response to Defendants' Memorandum of Law." (Dkt. 163.)

Plaintiff's "response" at docket no. 119 is not an appropriate response to Defendants' statement of material facts.

Although courts construe *pro se* pleadings liberally, *see Thomas v. Williams*, 822 F.3d 378, 385 (7th Cir. 2016), a plaintiff's *pro se* status does not excuse him from complying with federal and local procedural rules. *See McNeil v. United States*, 508 U.S. 106, 113 (1993) ("[W]e have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Collins v. Illinois*, 554 F.3d 693, 697 (7th Cir. 2009) ("[E]ven *pro se* litigants must follow procedural rules."). Local Rule 56.1 "provides the only acceptable means of disputing the other party's facts and of presenting additional facts to the district court." *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1317 (7th Cir. 1995); *see also Cichon v. Exelon Generation Co.*, 401 F.3d 803, 809-10 (7th Cir. 2005).

---

[1] On April 14, 2026, Plaintiff filed a document captioned as a "motion to strike Defendants' statement of material facts in their motion for summary judgment and response to Mr. Wagner's additional facts" (Dkt. 125). In this document, Plaintiff complains that the Defendants' statement of facts and their response to his additional facts "are really long" and "not in compliance with . . . summary judgment rule 56.1[.]" (*Id.* at pg. 1.) Plaintiff states that he "had a[n] extreme difficult time responding" and he asks that the Court strike Defendants' statement of material facts and their response to Plaintiff's additional facts. Plaintiff's motion (Dkt. 125) is denied. ***To be clear, Plaintiff brought this lawsuit, which asserts numerous constitutional claims against numerous Defendants.*** As will be discussed below, that Defendants' factual statement is lengthy speaks to the amount of care provided to Plaintiff during the timeframe relevant to his complaint. In defending against this suit, Defendants have appropriately responded to Plaintiff's allegations and submitted summary judgment materials that comply with both the Federal and Local Rules. The length of Defendants' statement of facts does not excuse Plaintiff from his obligation to properly respond.

Because Plaintiff did not properly respond to Defendants' LR 56.1 statement of facts, the Court accepts Defendants' "uncontroverted version of the facts to the extent that it is supported by evidence in the record." *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 880 (7th Cir. 2012).

Similarly, the Court considers Plaintiff's "additional facts" (which he has inserted at pages 41-43 of docket no. 119) only to the extent they are supported by the record or where Plaintiff could properly testify about the matters asserted. *See Sistrunk v. Khan*, 931 F. Supp. 2d 849, 854 (N.D. Ill. 2013); *see also* Fed. R. Evid. 602.

With these guidelines in mind, the Court turns to the facts of this case, stating those facts as favorably to Plaintiff as the record and LR 56.1 permit. *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012).

## II.    Facts

Plaintiff is an inmate at Dixon Correctional Center.  (Dkt. 98, Defendants' Statement of Facts, ¶ 1.)  He does not have any medical training.  (*Id.*)  Plaintiff works in the optical lab at Dixon fabricating glasses for other inmates.  (*Id.*)

Defendant Dr. Sy is a medical doctor licensed to practice medicine in Illinois.  (*Id.* at ¶ 2.) During the time relevant to this suit, Dr. Sy was employed by Wexford as the medical director for Dixon.  (*Id.*)  In this role, his job duties included providing medical care and treatment to inmates at the prison and participating in collegial reviews regarding requests for off-site medical care and treatment for inmates.  (*Id.*)

Defendant Dr. Zahtz is a medical doctor licensed to practice medicine in Illinois. (*Id.* at ¶ 3.)  Dr. Zahtz was employed by Wexford as a physician at Dixon, where he served as medical director until March 29, 2022, at which time he transferred to Sheridan Correctional Center.  (*Id.*) Dr. Zahtz's job duties included providing medical care and treatment to inmates at the prison and

participating in collegial reviews regarding requests for off-site medical care and treatment for inmates. (*Id.*)

Defendant Dr. Popovich is an optometrist licensed to practice in the State of Illinois. (*Id.* at ¶ 4.) During the time relevant to this suit, Dr. Popovich was employed by Wexford as an optometrist at Dixon. (*Id.*) His job duties include providing visual exams and treatment to patients with vision issues, prescribing eye medications for patients and referring patients to off-site providers for further evaluation and care as needed. (*Id.*)

Defendant Cantu worked for Wexford at Dixon from December 5, 2016, through September 26, 2023, as a medical records clerk. (*Id.* at ¶ 5.) As part of her job duties, Cantu scheduled medical appointments for inmates with off-site providers. (*Id.*) She did not provide clinical treatment to inmates. (*Id.*) She also had no control over the schedules of off-site providers. (*Id.*)

At the relevant time, Defendant, Wexford provided medical care and treatment to inmates at Dixon under a contract with the State of Illinois. (*Id.* at ¶ 6.)

### *Plaintiff's Medical Care and Treatment*

On June 29, 2020, Plaintiff was taken to the emergency room at Katherine Bethea Shaw Hospital ("KSB") in Dixon, Illinois for elevated blood pressure and a reported headache, at which time Plaintiff saw Dr. James Gallant. (*Id.* at ¶ 7.) During admission, Plaintiff made no complaints about chest pain, shortness of breath, or confusion. (*Id.*) Plaintiff also admitted to KSB staff his habit of being sedentary, overeating, and his understanding that he needed to change these aspects of his behavior. (*Id.*) Plaintiff was administered Hydralazine by IV and discharged in stable and improved condition, with instructions to take twenty-five milligrams of Hydralazine every six hours in addition to his other medications and otherwise follow-up with the Dixon healthcare unit.

(*Id.*)

Upon his return to Dixon from KSB that same day, Plaintiff met with Dr. Zahtz. (*Id.* at ¶ 8.) Plaintiff reiterated his dietary habits, including his high salt intake and caffeine intake, and was reminded by Dr. Zahtz to make dietary changes for his hypertension. (*Id.*) Dr. Zahtz also noted the KSB emergency room administered Hydralazine to Plaintiff and planned to continue this prescription and monitor Plaintiff's responsiveness. (*Id.*) Dr. Zahtz also planned for Plaintiff to undergo regular blood pressure checks for the next two weeks and to follow up with a provider in one to two weeks. (*Id.*)

Within two weeks—on July 9, 2020—Dr. Zahtz saw Plaintiff to follow up on his blood pressure. (*Id.* at ¶ 9.) At that time, Plaintiff advised he was "doing okay" and that, although he had not yet started exercising, he had made positive changes to his diet. (*Id.*) He also noted his blood pressure was in a better range since his last appointment. (*Id.*) On examination, Dr. Zahtz found Plaintiff's vital signs were stable. (*Id.*) Dr. Zahtz noted Plaintiff had no jugular vein distention, no clubbing, cyanosis, or edema, and his lung sounds were mostly clear. (*Id.*) Dr. Zahtz found Plaintiff's abdomen to be obese, soft, and non-tender. (*Id.*) Dr. Zahtz assessed Plaintiff with hypertension and obesity and planned for Plaintiff to continue with blood pressure checks twice daily for one month, increased his Hydralazine dosage to fifty milligrams three times a day, and advised Plaintiff to engage in low resistance exercise and maintain a healthy diet. (*Id.*)

On October 29, 2020, Dr. Zahtz met with Plaintiff to discuss the findings of a recent renal ultrasound performed on October 7, 2020. (*Id.* at ¶ 10.) Dr. Zahtz noted that everything was normal on the ultrasound except for a small "5 mm non-obstructing intrarenal calculus right kidney," which Plaintiff claimed "hurt[]" him in his right flank. (*Id.*) Dr. Zahtz explained the reported right flank pain was not due to a kidney stone, and he planned for Plaintiff to follow up

further with a nurse practitioner. (*Id.*)  Dr. Zahtz planned to reevaluate Plaintiff's pain management protocol, and ordered blood pressure checks, pulse checks, blood testing, and a follow-up appointment with a provider in two weeks.  (*Id.*)

On November 2, 2020, Plaintiff underwent the lab testing ordered by Dr. Zahtz on October 29, 2020.  (*Id.* at ¶ 11.)  The results showed Plaintiff's CPK[2] level was elevated.  (*Id.*)  Dr. Zahtz noted the CPK levels were non-specific and planned to repeat the labs in the future.  (*Id.*)

On November 12, 2020, Dr. Zahtz saw Plaintiff to follow up on his October 29, 2020, appointment.  (*Id.* at ¶ 12.)  Dr. Zahtz noted Plaintiff reported he was "doing okay" and that his blood pressure was in the 135-140 range when taken, though Plaintiff stated he was still anxious. (*Id.*)  Dr. Zahtz also noted Plaintiff was tolerating the increase in his Hydralazine along with his other medications.  (*Id.*)  Dr. Zahtz reviewed Plaintiff's labs and advised Plaintiff of his increased CPK level.  (*Id.*)  Dr. Zahtz noted Plaintiff's continued reported right-side pain was unclear in etiology, but noted he believed it was musculoskeletal in nature. (*Id.*)  Plaintiff stated he wanted his Gabapentin increased, but Dr. Zahtz planned to gather further labs from Plaintiff before adjusting his medications.  (*Id.*)

On December 15, 2020, Plaintiff had further labs drawn, which showed Plaintiff had elevated CPK and LDH[3] levels.  (*Id.* at ¶ 13.)  Dr. Zahtz noted that Plaintiff had recently tested positive for COVID-19, which he suspected may have skewed the results, and therefore planned

---

[2]  According to WebMD, CPK is "[c]reatine phosphokinase[.]"  *See* https://www.webmd.com/a-to-z-guides/what-is-the-cpk-enzyme-test#1-1 (last visited July 10, 2026).  The website defines CPK as an "enzyme — a protein that brings about specific chemical changes in your body."  (*Id.*)  The website explains that "the function of the CPK enzyme is to add a phosphate group to creatine, a naturally occurring chemical found in your muscle cells. As a result, creatine turns into phosphocreatine — a high-energy substance used by your body to generate energy."  (*Id.*) The website explains further that "[h]igher-than-normal CPK enzyme levels could be a sign of problems associated with your heart, brain, or skeletal muscles.  (*Id.*)

[3]  WebMd explains that "LDH is an enzyme that turns sugar into energy." *See* https://www.webmd.com/a-to-z-guides/lactic-acid-dehydrogenase-test (last visited July 10, 2026.)  The website explains further that "[h]igher LDH levels in blood may be a sign of tissue damage or disease." (*Id.*)

to collect further labs from Plaintiff. (*Id.*) Plaintiff's labs were subsequently re-drawn on January 19, 2021. (*Id.*)

On January 27, 2021, Dr. Zahtz saw Plaintiff regarding his abnormal lab findings. (*Id.* at ¶ 14.) Plaintiff reported he was "generally okay" but felt weak, fatigued, and worried about his abnormal lab tests. (*Id.*) Dr. Zahtz discussed with Plaintiff his lab test results, explaining they were mostly in appropriate ranges except for persistent increased LDH and CPK. (*Id.*) Dr. Zahtz explained that these elevated results could be due to multiple causes, including Plaintiff's medications, his recent positive COVID-19 status, or being off his CPAP machine for an extended period. (*Id.*) Dr. Zahtz planned to collect further labs from Plaintiff, including those for CPK and LDH, planned a subsequent follow-up with Plaintiff in two weeks, and planned for Plaintiff to be provided with a basin to clean his CPAP machine. (*Id.*)

On February 27, 2021, Dr. Popovich performed an eye exam on Plaintiff. (*Id.* at ¶ 15.) Plaintiff stated he needed his intraocular pressure checked, claiming he had fluctuating vision in both eyes. (*Id.*) Dr. Popovich noted Plaintiff was not using eye drops and had no other complaints about his vision. (*Id.*) On examination, Dr. Popovich found that Plaintiff's intraocular pressures were within normal limits for both eyes. (*Id.*) Dr. Popovich assessed Plaintiff with mild dry eye syndrome in both eyes and prescribed him eyedrops, to be taken four times a day in both eyes. (*Id.*) Dr. Popovich planned for Plaintiff to return to the Dixon eye clinic the following month for a routine screening for diabetic macular edema. (*Id.*)

On March 6, 2021, Plaintiff's CPK and LDH were remeasured, and he subsequently discussed the findings with Dr. Zahtz on March 10, 2021. (*Id.* at ¶ 16.) During the appointment, Dr. Zahtz noted Plaintiff's condition was generally unchanged, but Plaintiff was concerned about his elevated CPK and LDH. (*Id.*) Dr. Zahtz discussed with Plaintiff several possible reasons for

8

the increased levels, including medications and late effects of COVID-19. (*Id.*) Dr. Zahtz planned to check medication interactions and consult with a specialist, as needed, with more specialized tests as necessary for further investigation. (*Id.*) He noted that the cause of Plaintiff's elevated labs was still to be determined. (*Id.*) Dr. Zahtz also ordered Plaintiff medications for his seasonal allergies at this time. (*Id.*)

On March 13, 2021, Dr. Popovich saw Plaintiff for a routine eye exam for diabetic retinopathy screening. (*Id.* at ¶ 17.) Plaintiff denied any present vision changes, including flashes or floaters, and Dr. Popovich found no signs of diabetic retinopathy in either of his eyes. (*Id.*) Dr. Popovich's assessment notes indicate "GLC suspect" and show that he referred Plaintiff for a vision test. (*Id.*) Dr. Popovich otherwise planned for Plaintiff to return in six months. (*Id.*)

On March 17, 2021, Dr. Zahtz saw Plaintiff to discuss his abnormal CPK and LDH lab levels. (*Id.* at ¶ 18.) Plaintiff told Dr. Zahtz he was "feeling worse" and "exhausted," experienced shortness of breath on exertion, and felt "sleepy" despite using his CPAP machine appropriately. (*Id.*) Dr. Zahtz determined, after checking with Dixon pharmacy staff, that Zocor was a possible source of Plaintiff's increased CPK. (*Id.*) Dr. Zahtz also noted Plaintiff stopped his Zocor on January 25, 2021, after being seen at a regular medical appointment. (*Id.*)

On exam, Dr. Zahtz found Plaintiff's vital signs were stable. (*Id.* at ¶ 19.) He noted Plaintiff displayed shortness of breath on exertion after walking in the hall of the unit, but only decreased breathing sounds, without wheezes/rhonchi. (*Id.*) Dr. Zahtz noted Plaintiff's heart rate was approximately sixty bpm, his abdomen was obese and non-tender, and Plaintiff had no clubbing, cyanosis, or edema. (*Id.*) Dr. Zahtz assessed Plaintiff with shortness of breath on exertion, muscle weakness and exhaustion with elevated CPK levels, morbid obesity, and a recent history of COVID-19. (*Id.*) Dr. Zahtz then had Plaintiff sent to the KSB emergency room for evaluation of

9

worsening shortness of breath on exertion, muscle weakness, and worsening elevated CPK levels. (*Id.*)

On March 17, 2021, Plaintiff presented to the KSB emergency room, at which time he was seen by Dr. Jeffrey Fogle. (*Id.* at ¶ 20.) Dr. Fogle examined Plaintiff and noted that the exam was not suggestive for diagnoses of pneumonia, bronchitis, congestive heart failure, pulmonary edema, and that acute coronary syndrome was a "less likely" diagnosis. (*Id.*) Dr. Fogle further noted that Plaintiff was not tachycardic, hypoxic or on any rate limiting medications that would mask tachycardia, and so there was a low suspicion for pulmonary embolism. (*Id.*) Dr. Fogle noted that Plaintiff's cardiac workup at KSB was "unremarkable" and he was discharged back to Dixon after his condition improved in the KSB emergency room. (*Id.*)

When discharged, Dr. Fogle made several recommendations for further care for Plaintiff. (*Id.* at ¶ 21.) Dr. Fogle recommended a follow-up with "a neurologist or someone who can do a muscle biopsy." (*Id.*) Dr. Fogle also recommended Plaintiff discontinue Simvastatin (Zocor), noting it could potentially be a cause for his elevated CPK. (*Id.*) These recommendations were approved, and Dr. Zahtz specifically noted that Plaintiff had already discontinued his Zocor as of January 25, 2021. (*Id.*)

On March 18, 2021, Dr. Zahtz saw Plaintiff to follow up on his KSB ER visit from the previous day. (*Id.* at ¶ 22.) Dr. Zahtz noted that Plaintiff's CPAP treatment had been modified to further address his obstructive sleep apnea (OSA). (*Id.*) Dr. Zahtz also discussed appropriate habits for Plaintiff to better control his blood pressure. (*Id.*) Dr. Zahtz planned for Plaintiff to undergo a follow up with an offsite ENT specialist regarding his sleep apnea and undergo additional labs that coming Monday. (*Id.*) Dr. Zahtz noted that, if there was no improvement in Plaintiff's lab results, he would plan for Plaintiff to get a rheumatology evaluation and a subsequent

muscle biopsy, if indicated. (*Id.*) Dr. Zahtz was concerned that Plaintiff's elevated CPK and LDH levels might be related to his sleep apnea, which can cause tissue damage due to deprivation of oxygen. (*Id.*) The ENT diagnosed Plaintiff with obstructive sleep apnea and recommended weight loss and a repeat sleep study, which Dr. Zahtz planned to order. (*Id.*)

On March 22, 2021, and again on April 5, 2021, Plaintiff underwent diagnostic lab testing, including testing his CPK and LDH levels. (*Id.* at ¶ 23.) Plaintiff's March 22, 2021, testing showed a decrease and improvement in his CPK and LDH levels, but his April 5, 2021, results showed a subsequent increase in these values. (*Id.*)

On April 13, 2021, Plaintiff saw NP Mershon to assess his increased blood pressure. (*Id.* at ¶ 24.) Plaintiff had no concerns at this time, and NP Mershon again advised him of the importance of losing weight to manage his health. (*Id.*) NP Mershon also adjusted his Hydralazine and noted his other active prescriptions for hypertension including Maxzide, Hytrin, Lopressor and Lisinopril. (*Id.*) She also planned for Plaintiff to undergo routine blood pressure and heart rate checks for the next two months. (*Id.*)

On April 23, 2021, NP Mershon saw Plaintiff to assess his hypertension. (*Id.* at ¶ 26.) Plaintiff advised that he wished to make lifestyle/dietary modifications and focus on losing weight as opposed to adjusting his medications, and NP Mershon discussed this with him. (*Id.*) On exam, NP Mershon found Plaintiff to be in no acute distress, with unremarkable cardiac findings, his lungs were clear to auscultation, and he had no edema present. (*Id.*) NP Mershon ordered Plaintiff's blood pressure and heart rate checks be continued. (*Id.*)

On May 29, 2021, Dr. Popovich saw Plaintiff to assess him for his complaints of seeing spots in his right eye. (*Id.* at ¶ 26.) Plaintiff described these spots as "intermittent" and "worst when eyes are dry," with the spots located in his central vision. (*Id.*) Plaintiff stated he noticed

11

them when watching TV and that his eyes were "burning" with irritation and itchiness. (*Id.*) Plaintiff stated he had been rubbing his eyes "a lot" as well. (*Id.*) He explicitly denied follicles or any other visual complaints. (*Id.*)

On exam, Dr. Popovich assessed Plaintiff with tear film debris, a nuclear sclerotic cataract, and vitreous syneresis in both of his eyes. (*Id.* at ¶ 27.) Dr. Popovich further assessed Plaintiff with dry eye syndrome and allergy-induced conjunctivitis. (*Id.*) Based on these assessments, Dr. Popovich prescribed Plaintiff preservative-free artificial tears, to be used six to eight times per day in both eyes and eye drops in both eyes twice a day and planned for Plaintiff to return to the clinic in six weeks. (*Id.*)

On June 10, 2021, NP Susan Tuell saw Plaintiff to assess his blood pressure, sleep apnea, and his CPK levels. (*Id.* at ¶ 28.) Plaintiff reported having dental pain, poor sleep, "sore nares [*sic*]," and dry throat at night from his CPAP machine. (*Id.*) Plaintiff also reported no resolution to his increased CPK levels, although his cardiac workup was negative for adverse findings. (*Id.*) On exam, NP Tuell found Plaintiff to be alert and oriented and in no acute distress. (*Id.*) She also found that Plaintiff's blood pressure had remained within recommended ranges. (*Id.*) Based on her assessment, NP Tuell adjusted Plaintiff's Hydralazine prescription and ordered regular blood pressure checks for Plaintiff. (*Id.*) She also referred Plaintiff for a muscle biopsy to assess his elevated CPK issue. (*Id.*)

On or about June 16, 2021, Wexford approved Plaintiff for a muscle biopsy. (*Id.* at ¶ 29.) However, the approval did not specify which off-site specialist would perform the muscle biopsy. (*Id.*) Medical records clerk Cantu could not schedule an appointment for a muscle biopsy without knowing the provider who would perform the procedure, and to her knowledge, there was no specialist who had ordered the biopsy. (*Id.*)

On July 28, 2021, Dr. Popovich saw Plaintiff for his six-week follow-up. (*Id.* at ¶ 30.) Plaintiff reported temporary relief of his eye irritation with the eye drops Dr. Popovich prescribed. (*Id.*) Plaintiff had no other new eye complaints. (*Id.*) Based on these findings, Dr. Popovich adjusted the dosing protocol for Plaintiff's Pataday medication and otherwise planned to see him for a scheduled, routine exam. (*Id.*)

On September 2, 2021, Dr. Popovich saw Plaintiff to check his intraocular pressures. (*Id.* at ¶ 31.) Plaintiff complained that he still had dry eyes at this time. (*Id.*) Dr. Popovich observed tear film debris, papillae, and nuclear sclerotic cataracts in both of Plaintiff's eyes. (*Id.*) Dr. Popovich measured Plaintiff's intraocular pressures in both eyes at sixteen. (*Id.*) Dr. Popovich suspected Plaintiff may have been at risk for developing glaucoma and referred him for a visual exam at this time. (*Id.*) Further, while continuing Plaintiff's existing plan of care, he also prescribed Plaintiff a course of Prednisolone Forte eye drops and planned to reassess Plaintiff in two weeks. (*Id.*) Plaintiff was approved for the visual exam per Dr. Popovich's referral on September 15, 2021. (*Id.*)

On September 16, 2021, Dr. Popovich saw Plaintiff again to check his intraocular pressures and to assess his dry eye syndrome. (*Id.* at ¶ 32.) Plaintiff reported still having to "blink to wet [his] eyes" despite being on prednisolone forte, though he had no other complaints. (*Id.*) Dr. Popovich planned for Plaintiff to continue his course of treatment, while also adding a prescription of Restasis, and he planned to see Plaintiff again in six weeks. (*Id.*) Dr. Popovich also noted Plaintiff's intraocular pressures appeared normal, but that he had a visual test pending, and a routine diabetic eye exam pending in six months. (*Id.*)

On October 21, 2021, Dr. Popovich saw Plaintiff again to assess his dry eye syndrome. (*Id.* at ¶ 33.) Plaintiff reported still having to intentionally blink to moisten his eyes. (*Id.*) Dr.

Popovich advised Plaintiff that Restasis may take four to six months to take full effect and encouraged him to continue using this medication. (*Id.*) Dr. Popovich also noted that Plaintiff had undergone his visual exam, which revealed potential arcuate defects, and referred him to an ophthalmology specialist for further assessment. (*Id.*) On November 11, 2021, Wexford approved Dr. Popovich's ophthalmology referral request. (*Id.*)

On March 23, 2022, Dr. Popovich saw Plaintiff for his complaint about itchy eyes. (*Id.* at ¶ 34.) Plaintiff advised Dr. Popovich that he was not taking his Pataday as directed, and Dr. Popovich reminded him of the importance of taking his medications as directed. (*Id.*) Dr. Popovich assessed Plaintiff with allergy-induced conjunctivitis and planned for Plaintiff to continue his present course of treatment, provided he take his Pataday as directed, and further noted Plaintiff had an ophthalmology consultation pending. (*Id.*)

On April 15, 2022, Plaintiff saw NP Tuell to assess his CPK and LDH levels, which recent lab work had shown were still elevated. (*Id.* at ¶ 35.) NP Tuell noted that Plaintiff had been approved for a muscle biopsy since June 17, 2021, but had not yet undergone the biopsy. (*Id.*) She sent an email to the health care unit and writ office to follow up on this biopsy and planned to follow up with Plaintiff as needed. (*Id.*)

On June 14, 2022, Plaintiff saw a Dixon nurse with complaints of burping, which he claimed had persisted for "a couple of weeks" since he had contracted COVID-19. (*Id.* at ¶ 36.) Plaintiff reported no pain associated with this burping and a normal appetite, and the nurse observed no abnormal findings on exam. (*Id.*) The nurse placed Plaintiff on the nurse practitioner line for further assessment. (*Id.*)

On June 17, 2022, NP Mershon saw Plaintiff to assess his complaints of excessive burping. (*Id.* at ¶ 37.) She noted Plaintiff's reports that his burping was not relieved by his medications,

14

including Simethicone. (*Id.*) On exam, NP Mershon found that, while Plaintiff was morbidly obese, his lungs were clear, his heart had a regular rate and rhythm, and his examination was otherwise unremarkable. (*Id.*) She also checked his CPAP machine for any leaks and found none. (*Id.*) NP Mershon planned to follow up with Plaintiff on June 23, 2022. (*Id.*) NP Mershon referred Plaintiff to a local gastrointestinal specialist based on his complaints, while otherwise noting he was to return to UIC Ophthalmology in three months. (*Id.*) Wexford then approved Plaintiff for a local gastroenterology consultation and a follow-up appointment at UIC Ophthalmology. (*Id.*)

On June 23, 2022, NP Mershon noted that Plaintiff's burping issue had apparently resolved. (*Id.* at ¶ 38.)

On June 24, 2022, Plaintiff saw Dr. Brian Krawitz at the UIC general eye clinic to assess Plaintiff's complaints of constant itching/tearing, difficulty with his visual acuity despite wearing glasses, and on suspicion of glaucoma raised by Dr. Popovich. (*Id.* at ¶ 39.) On exam, Dr. Krawitz noted diffuse loss, poor reliability, and "cloverleaf pattern" demonstrated in Plaintiff's right eye. (*Id.*) In Plaintiff's left eye, Dr. Krawitz observed splitting of fixation caused by a superior arcuate scotoma, mild intraneural facilitation loss, and poor fixation on gaze tracker testing. (*Id.*) Despite these findings, Dr. Krawitz found that the apparent visual defects did not correlate with Plaintiff's optic nerve appearance. (*Id.*) Dr. Krawitz recommended artificial tears for lubrication, but otherwise recommended observation. (*Id.*) Dr. Krawitz recommended a follow up in three months, and placed orders for visual testing and optical coherence tomography testing. (*Id.*) Dr. Krawitz's recommendations were adopted by NP Mershon, in full, on July 1, 2022. (*Id.*)

On July 1, 2022, NP Mershon saw Plaintiff for a writ return appointment following an appointment he had with UIC Ophthalmology. (*Id.* at ¶ 40.) NP Mershon discussed the ophthalmology provider's findings and Plaintiff agreed with the plan. (*Id.*) Plaintiff also requested

15

further intervention for continuous burping at this time. (*Id.*) NP Mershon noted that Plaintiff's abdomen was soft/nontender, he recently tested negative for H. Pylori bacteria, and his CPAP was checked and had no air leaks. (*Id.*) However, NP Mershon referred Plaintiff to a local gastroenterologist based on his complaints of intermittent burping, while otherwise noting he was to return to UIC Ophthalmology in three months. (*Id.*) Wexford subsequently approved NP Mershon's referrals for Plaintiff to see a local gastrointestinal specialist and to return to UIC's Ophthalmology clinic. (*Id.*)

On July 11, 2022, Dr. Sy saw Plaintiff to follow up on his hypertension management. (*Id.* at ¶ 41.) During this appointment, Plaintiff reported burping frequently for the past one to two months, though he did not have heartburn. (*Id.*) Plaintiff also advised he had taken proton pump inhibitors, used to treat conditions such as heartburn, acid reflux disease (GERD), and peptic ulcers, that he received from another inmate for a few days, but that this did not help. (*Id.*) Dr. Sy referred Plaintiff for H. Pylori testing and also prescribed him Clonidine for his hypertension. (*Id.*)

On July 21, 2022, Dr. Popovich saw Plaintiff for a follow-up eye exam. (*Id.* at ¶ 42.) Dr. Popovich noted Plaintiff was being managed by UIC Ophthalmology, whom he had last seen in June 2022, and he had no new complaints. (*Id.*) On exam, Dr. Popovich found the condition of Plaintiff's eyes were stable. (*Id.*) Dr. Popovich planned to continue Plaintiff's present course of treatment and monitor his condition while following up with UIC Ophthalmology as directed. (*Id.*)

On September 19, 2022, IDOC Coordinator Barb spoke with staff of the UIC Neurosurgery Clinic regarding a possible muscle biopsy for Plaintiff. (*Id.* at ¶ 43.) UIC staff advised the IDOC Coordinator that they would not/could not schedule Plaintiff for a muscle biopsy without a referral including a diagnosis. (*Id.*) Otherwise, Plaintiff would need to be scheduled for a new patient consultation with the neurosurgery clinic. (*Id.*)

16

On September 27, 2022, Dr. Sy saw Plaintiff to re-evaluate a potential muscle biopsy for him. (*Id.* at ¶ 44.) Plaintiff reported feeling sluggish, with low back pain, and the inability to do a single push-up. (*Id.*) Dr. Sy reviewed Plaintiff's chart which showed he had a BMI of 44, and his CPK appeared labile, but with his last lab result from April of 2022 elevated at 657. (*Id.*) Notwithstanding his reported low back pain, Plaintiff did not report other muscle aches. (*Id.*) Dr. Sy planned to recheck Plaintiff's CPK and follow up with Plaintiff in two to three weeks to discuss the results. (*Id.*) Plaintiff subsequently underwent these lab tests on September 30, 2022, which showed elevated CPK. (*Id.*)

On October 18, 2022, Dr. Sy saw Plaintiff regarding his hypertension (including possible medication changes regarding his Clonidine), as well as to follow up regarding his CPK levels. (*Id.* at ¶ 45.) Plaintiff still had elevated CPK levels, and reported some low back pain, but stated he otherwise felt "okay." (*Id.*) On exam, Dr. Sy found Plaintiff's lungs to be clear, his heart had a regular rate and rhythm, and his abdomen was soft and nontender. (*Id.*) Dr. Sy noted Plaintiff was not on statin medications at this time, and he demonstrated normal strength on a manual muscle test Dr. Sy administered. (*Id.*) Based on these findings, Dr. Sy referred Plaintiff to a rheumatologist to further assess the etiology for his elevated CPK. (*Id.*) Wexford approved this rheumatology referral on October 27, 2022. (*Id.*)

On January 5, 2023, NP Tuell saw Plaintiff regarding his complaints of low back pain and regarding his reported frequent burping. (*Id.* at ¶ 46.) Plaintiff requested she re-start his Robaxin prescription because his back was "acting up" and inquired about the status of his GI consult. (*Id.*) After inquiring with the writ office, NP Tuell noted that Plaintiff had been scheduled for his GI appointment, and the providers had provided a date for his appointment with them. (*Id.*) NP Tuell also prescribed Plaintiff Robaxin pursuant to his requests and planned to follow up with him in

17

two to three weeks.  (*Id.*)

Two weeks later—on January 19, 2023— NP Tuell saw Plaintiff regarding a toenail trim and as a follow-up to her prior appointment with him on January 5, 2023.  (*Id.* at ¶ 47.)  Plaintiff reported some pain relief from the Robaxin he was prescribed.  (*Id.*)  Regarding his continual burping, NP Tuell discussed prescribing Simethicone for Plaintiff, which her notes indicate he was "willing to try."[4]  (*Id.*)  NP Tuell prescribed him Simethicone and planned to follow up with him as needed.  (*Id.*)

On February 2, 2023, NP Chelsea Sword saw Plaintiff regarding his Simethicone prescription.  (*Id.* at ¶ 48.)  Plaintiff complained that the Simethicone was not helping his burping and wanted "something else" but also wanted to keep the Simethicone.  (*Id.*)  Plaintiff denied any nausea, vomiting, diarrhea, constipation, or abdominal pain.  (*Id.*)  On exam, NP Sword observed Plaintiff was in no acute distress, with an upright and steady gait, lungs clear, and heart sounds with a regular rate and rhythm.  (*Id.*)  NP Sword found no costovertebral angle tenderness, found Plaintiff's abdomen to be soft and nontender, and positive bowel sounds in all four quadrants.  (*Id.*)  Based on these findings, as well as Plaintiff's requests, NP Sword prescribed Plaintiff Prilosec, while maintaining his Simethicone prescription.  (*Id.*)  She also noted Plaintiff had an approved and scheduled GI appointment pending, and she planned to follow up with Plaintiff onsite on March 2, 2023, or sooner, if needed.  (*Id.*)

On February 8, 2023, Dr. Popovich saw Plaintiff regarding his complaints of a swollen, crusty upper eyelid on his left eye.  (*Id.* at ¶ 49.)  Upon exam, this area was tender to touch, though

---

[4]  It is not entirely clear from the record when (or at what point) Plaintiff first started taking Simethicone medication. NP Tuell's notes from **January 19, 2023**, show that she discussed the use of Simethicone medication with Plaintiff and he indicated he was "willing to try." (*See* Dkt. 98-2 at pg. 146.)  As set forth above though, NP Mershon's notes from **June 17, 2022**, indicate that Plaintiff was taking Simethicone medication at or around that time (and it was not working). (*See id.* at pg. 104.)

Plaintiff advised it "ha[d] gotten better since it started." (*Id.*) Dr. Popovich noted that Plaintiff had a small bump on his upper lid and assessed Plaintiff with an actively resolving hordeolum. (*Id.*) Plaintiff had no other new vision complaints at this time. (*Id.*) Dr. Popovich recommended lubricating eye drops four times daily for his left eye and a course of Keflex for the next ten days. (*Id.*) He advised Plaintiff to return to the Dixon clinic as needed and planned for Plaintiff to follow up with UIC ophthalmology as needed, noting Plaintiff was currently being managed by these providers. (*Id.*)

On February 13, 2023, Plaintiff saw Dr. Allyshah Allahdina at UIC's Glaucoma Clinic. (*Id.* at ¶ 50.) Dr. Allahdina assessed Plaintiff with dry eyes and skin darkening, but noted he was at low risk for glaucoma, as his intraocular pressures were stable. (*Id.*) Dr. Allahdina recommended yearly monitoring/examinations, discontinuing Pataday and instead using Restasis, applying petroleum jelly to his periocular skin, and using transition or UV spectacles. (*Id.*) Dr. Sy approved all these recommendations and plans on February 17, 2023. (*Id.*)

On March 2, 2023, Dr. Sy saw Plaintiff for a writ return following an offsite appointment he had with UIC Nephrology specialists. (*Id.* at ¶ 52.) Plaintiff also told him he had issues with recurrent burping, and that he previously took Simethicone and Prilosec but that these did not help his symptoms. (*Id.*) Dr. Sy noted Plaintiff was awaiting an offsite appointment with a GI specialist at this time, but Dr. Sy also ordered H. Pylori testing to be done for Plaintiff and ordered his Prilosec prescription to be held for the following two weeks to be resumed after a sample was collected for H. Pylori testing to avoid tainting the sample. (*Id.*) Dr. Sy also adjusted Plaintiff's blood pressure medications as recommended by UIC Nephrology, ordered blood pressure testing for Plaintiff, and planned for him to follow up with UIC Nephrology as indicated. (*Id.*)

On March 9, 2023, Dr. Popovich saw Plaintiff for an eye examination. (*Id.* at ¶ 52.) During

the appointment, Plaintiff advised that he was using his Restasis and also stated that the increase in his Prednisolone Forte artificial tears helped his dry eye syndrome. (*Id.*) On exam, Dr. Popovich found Plaintiff's intraocular pressures to be within normal limits and assessed him with dry eye syndrome and allergy-induced conjunctivitis. (*Id.*) Dr. Popovich further noted that Plaintiff was being followed by UIC Ophthalmology and planned for him to continue following up with them as directed/recommended. (*Id.*)

On March 23, 2023, Dr. Sy saw Plaintiff for a follow-up appointment. (*Id.* at ¶ 53.) During the appointment, Plaintiff informed Dr. Sy he was feeling "okay" but his blood pressure was still high. (*Id.*) On exam, Dr. Sy found his lungs clear, his heart to have a normal rate and rhythm, and his abdomen to be soft and nontender but obese. (*Id.*) Dr. Sy also reviewed his recent H. Pylori lab results, which showed he tested negative, and his blood pressure check readings, which showed elevated blood pressure. (*Id.*) Dr. Sy ordered that Plaintiff start Nifedipine, a medication for hypertensive patients which also reduces angina symptoms, and noted that Plaintiff could resume Prilosec. (*Id.*) Dr. Sy also advised Plaintiff to lose weight, ordered blood pressure checks to be done for him four times a week for the next three weeks, and planned to follow up with him in three weeks after these blood pressure checks were completed. (*Id.*)

On April 5, 2023, Dr. Popovich saw Plaintiff, at which time he was given transition eyeglasses with his updated prescription from UIC. (*Id.* at ¶ 54.) Dr. Popovich further instructed Plaintiff to follow up with ophthalmology as directed. (*Id.*) On April 7, 2023, Plaintiff returned to the Dixon sick call for his eye issues, but Plaintiff informed the nursing staff that he had already been seen and did not need eye care at that time. (*Id.*)

On April 11, 2023, NP Sword saw Plaintiff for a chronic clinic assessment, at which time he denied any complaints. (*Id.* at ¶ 55.) NP Sword renewed Plaintiff's Vaseline and artificial tears

20

and planned to follow up with him in four weeks and at his next chronic clinic. (*Id.*)

On April 13, 2023, Dr. Sy saw Plaintiff for a follow-up appointment. (*Id.* at ¶ 56.) Plaintiff again told Dr. Sy he felt "okay," though Dr. Sy noted his blood pressure checks for the past four weeks still showed elevated levels. (*Id.*) Based on this Dr. Sy increased his dosing protocol for Nifedipine and planned for Plaintiff to return to the clinic in one month. (*Id.*)

On May 11, 2023, Plaintiff saw Dr. Shiva Arami with UIC Rheumatology for his generalized complaints of weakness and elevated CPK levels. (*Id.* at ¶ 57.) Dr. Arami conducted a physical examination which showed a slight muscle weakness for his right sided hip flexion and shoulder abduction, and recommended an MRI and EMG testing for further assessment, which Dr. Sy approved for him. (*Id.*) Plaintiff subsequently underwent the EMG with Dr. Diana Mnatsakanova, a UIC neurologist, which showed no evidence of neuropathy or peripheral neuropathy. (*Id.*)

On July 6, 2023, Dr. Sy saw Plaintiff to follow up with him regarding his chronic hypertension and to discuss the May 11, 2023m rheumatology labs. (*Id.* at ¶ 58.) Dr. Sy advised Plaintiff that he was unable to obtain Plaintiff's rheumatology labs from Plaintiff's May 11, 2023, UIC appointment at this time. (*Id.*) Dr. Sy advised Plaintiff that, because UIC had collected the labs and would not provide them to Dixon's staff, he would have to follow up with the UIC providers regarding these results. (*Id.*)

On September 6, 2023, Dr. Popovich saw Plaintiff for an optometry exam. (*Id.* at ¶ 59.) At the appointment, Plaintiff complained about eye dryness, and also advised Dr. Popovich he did not want his eyeglasses anymore. (*Id.*) Based on Plaintiff's eye dryness, Dr. Popovich prescribed Plaintiff a course of Ketorolac for two weeks and planned for Plaintiff to return to the clinic in two weeks or sooner if his symptoms worsened. (*Id.*) Plaintiff also turned in his eyeglasses at this

21

time. (*Id.*)

On September 20, 2023, Dr. Popovich saw Plaintiff for his two-week follow-up. (*Id.* at ¶ 60.) Plaintiff informed Dr. Popovich that he had symptom relief with Ketorolac and also requested to change his eyeglass lenses to his previous prescription from the year 2020. (*Id.*) Plaintiff had no other complaints at that time. (*Id.*) Dr. Popovich planned for Plaintiff to maintain his Ketorolac prescription, his regular follow ups with UIC Ophthalmology, and ordered replacement lenses to be filled for Plaintiff when his money voucher for the lenses cleared. (*Id.*)

On October 5, 2023, Plaintiff saw Dr. Courtney Goodman, a UIC rheumatologist, to assess his complaints of elevated CPK and LDH levels, and generalized weakness and fatigue. (*Id.* at ¶ 60.) Dr. Goodman's workup was negative for an autoimmune presentation, endocrine abnormality, or myositis, however, she noted his CRP inflammatory marker was elevated. (*Id.*) Her differential diagnoses included a viral etiology and/or paraneoplastic syndrome. (*Id.*) Dr. Goodman recommended HIV testing, further assessment with neurologist Dr. Diana Mnatsakova, and a subsequent appointment with UIC Rheumatology after both an MRI and evaluation by UIC Neurology. (*Id.*) Dr. Sy approved all of Dr. Goodman's recommendations. (*Id.*)

On October 10, 2023, Plaintiff saw NP Jaziel Chavira, a gastroenterology specialist at CGH Medical Center in Sterling, Illinois, to evaluate his complaints of constant burping. (*Id.* at ¶ 62.) NP Chavira assessed Plaintiff, noting his prior H. Pylori testing and course of treatment. (*Id.*) On exam, NP Chavira noted Plaintiff's abdomen to be soft and non-distended with active bowel sounds in all four quadrants, no rebound, guarding or rigidity, no organomegaly. (*Id.*) NP Chavira recommended Plaintiff undergo an esophagogastroduodenoscopy (EGD) and gastric emptying study, as well as increasing his then-active Pantoprazole prescription. (*Id.*)

Plaintiff underwent his gastric emptying study on March 13, 2024, and EGD testing on

May 17, 2024. (*Id.* at ¶ 63.) Both procedures were normal. (*Id.*)

On October 11, 2023, Dr. Sy saw Plaintiff following a Dixon nurse's referral for complaints of left eye pain. (*Id.* at ¶ 64.) On exam, Dr. Sy observed crusting to Plaintiff's left eye, noted Plaintiff's report of blurring vision and photophobia, and observed mild redness in Plaintiff's left eye. (*Id.*) Dr. Sy assessed Plaintiff with allergy-induced conjunctivitis and provided Plaintiff with Claritin, while noting he was also to see Dixon's optometry staff the next week. (*Id.*)

On October 18, 2023, Dr. Popovich saw Plaintiff upon Dr. Sy's referral for a flare up of Plaintiff's allergic conjunctivitis. (*Id.* at ¶ 65.) Dr. Popovich noted Plaintiff's symptoms had resolved with the use of Claritin, and he planned for Plaintiff to keep using Claritin while otherwise following up with UIC as recommended. (*Id.*) Plaintiff also received new eyeglasses on this same date. (*Id.*)

On March 5, 2024, Plaintiff was to undergo an MRI pursuant to the recommendations of UIC Rheumatology. (*Id.* at ¶ 66.) However, the attending radiologists advised that Plaintiff would first need to undergo an x-ray due to his history of a gunshot wound to ensure Plaintiff could undergo the MRI safely. (*Id.*) Dr. Sy approved Plaintiff to undergo these x-rays pursuant to the radiologist's directions. (*Id.*)

On March 7, 2024, Plaintiff saw Dr. Mnatsakova with UIC Neurology. (*Id.* at ¶ 67.) Dr. Mnatsakova noted that Plaintiff's EMG testing and her examinations showed no clear cause for Plaintiff's elevated CPK and reported weakness/fatigue, but she suspected a possible genetic cause for his symptoms, and recommended genetic testing, which Dr. Sy approved. (*Id.*)

Also on March 7, 2024, Plaintiff underwent the genetic testing recommended by Dr. Mnatsakova at UIC to further assess the etiology of his elevated CPK. (*Id.* at ¶ 68.) The results were obtained by UIC on April 25, 2024, which showed some genetic variants but did not provide

23

a molecular diagnosis. (*Id.*)

Also on March 7, 2024, Plaintiff saw a UIC physical therapist Julie Robuchard, who specializes in patients with Muscular Dystrophy and ALS. (*Id.* at ¶ 69.) On exam, Plaintiff demonstrated no remarkable findings, and Ms. Robuchard made no further physical therapy or equipment recommendations. (*Id.*)

On March 21, 2024, Dr. Popovich saw Plaintiff for an optometry examination. (*Id.* at ¶ 70.) Dr. Popovich noted Plaintiff did not have reddened eyes. (*Id.*) Plaintiff reported intermittent eye watering, but no other symptoms. (*Id.*) On exam, Dr. Popovich found Plaintiff's intraocular pressures to be within normal limits and that his eye condition was otherwise stable. (*Id.*) Dr. Popovich further noted Plaintiff continued to be followed by UIC Ophthalmology and sent a referral at this time for Plaintiff to continue care with them. (*Id.*)

On May 22, 2024, Plaintiff saw Dr. Ahmad Aref with UIC Ophthalmology. (*Id.* at ¶ 71.) On exam, Dr. Aref found Plaintiff did have symptomatic dry eye syndrome and photophobia symptoms, but he found Plaintiff to be "low risk" for glaucoma, found no evidence of peripheral retina pathology, and found a visually insignificant cataract. (*Id.*) Dr. Aref recommended Plaintiff continue his artificial tears as needed, continue his Restasis twice a day, return to the cornea clinic at the next available setting, and return to glaucoma clinic in one year. (*Id.*) Dr. Sy approved all of Dr. Aref's recommendations. (*Id.*)

On May 24, 2024, NP Chavira saw Plaintiff again to follow up on the findings from his EGD and gastric emptying study. (*Id.* at ¶ 72.) She noted that Plaintiff's gastric emptying study was normal, while his EGD showed reflux and mild chronic gastritis, and his biopsy taken during his EGD was negative for H. Pylori. (*Id.*) She also noted Plaintiff's symptoms were improved, that he reported no nausea, vomiting, or abdominal pain, denied dysphagia, dysphonia and

odynophagia, and reported his burping was "significantly better." (*Id.*) NP Chavira recommended Plaintiff stay on his current regimen of Omeprazole and add Carafate three times a day for eight weeks only, after which time he was supposed to discontinue the medication. (*Id.*) Dr. Sy approved all these recommendations and plans for Plaintiff. (*Id.*)

On August 29, 2024, Dr. Popovich saw Plaintiff, who presented with complaints of itchiness and burning in his eyes. (*Id.* at ¶ 73.) Plaintiff also advised he had stopped using his Pataday medication. (*Id.*) Dr. Popovich planned for Plaintiff to resume using his medication and advised him to return to the optometry clinic if his symptoms worsened or failed to improve. (*Id.*) Dr. Popovich also confirmed with the Dixon writ office that Plaintiff had been scheduled for an appointment with UIC Ophthalmology, which was pending at this time. (*Id.*)

On September 29, 2024, RN Poff saw Plaintiff in the Dixon healthcare unit for complaints of red eye induced by seasonal allergies. (*Id.* at ¶ 74.) She noted Plaintiff's left eye appeared swollen, with red sclera, and sensitive to light, accompanied by Plaintiff's subjective complaints of pain and itching. (*Id.*) However, she noted no change in Plaintiff's visual acuity at this time. (*Id.*) After contacting an on-call provider, RN Poff provided Plaintiff artificial tears and advised him to return to the clinic if he had no improvement in his symptoms. (*Id.*)

On September 30, 2024, NP Tuell saw Plaintiff, who reported that he still had left eye irritation. (*Id.* at ¶ 75.) Plaintiff also told NP Tuell that he did not like using Erythromycin ointment for this issue. (*Id.*) NP Tuell examined Plaintiff, noting that his left eye appeared reddened, but his vision remained intact. (*Id.*) Based on Plaintiff's reports he did not like erythromycin ointment, NP Tuell discontinued that medication and provided him with Maxitrol Ophthalmologic Solution. (*Id.*)

Also on September 30, 2024, Plaintiff saw APRN Diana Umali at the UIC Rheumatology

clinic, for further assessment of his elevated CPK and LDH, as well as his reported fatigue and weakness. (*Id.* at ¶ 76.) APRN Umali noted that despite extensive workup of inflammatory, myositis, autoimmune, and endocrine causes since his last visit, the cause for his symptoms remained unclear. (*Id.*) She recommended Plaintiff undergo additional diagnostic imaging tests, including an MRI, EMG, and chest X-ray, and undergo further evaluation with neurology and rheumatology services. (*Id.*)

Plaintiff saw a rheumatologist at UIC in early 2025 who diagnosed him with muscle deficiency after genetic testing and referred him to a doctor who "deals with muscles." (*Id.* at ¶ 77.)

### *The Declarations of Drs. Sy, Zahtz, and Popovich Concerning Plaintiff's Medical Care*

According to Defendants, at no time did they turn Plaintiff away from the health care unit, disregard his complaints, or otherwise deny him medical care and treatment; at no time did any aspect of Plaintiff's treatment at Dixon cause him to miss out on any treatment options; at no time during their treatment of Plaintiff did they rely upon any directives, policies, procedures, or other practices from Wexford Health Sources, Inc., but, instead, relied on their personal clinical judgment while treating Plaintiff; and, that they are unaware of any referrals submitted on Plaintiff's behalf, which were denied by Wexford at any time relevant to the allegations in this suit. (*Id.* at ¶ 78.)

### *The Declarations of Drs. Sy and Zahtz Concerning Plaintiff's Medical Care for his Elevated CPK and LDH levels*

According to these declarations, CPK is an enzyme primarily found in muscle tissue that helps convert creatine to creatine phosphate; elevated CPK may be caused by a muscle injury or muscle disease; some patients have elevated CPK levels without any known cause, which was true in Plaintiff's case; LDH is an enzyme found in tissue that helps convert lactate to pyruvate,

which is used for energy production; LDH levels alone cannot be used to diagnose a specific condition; and, at no time did they observe Plaintiff to have any medical conditions that definitively accounted for Plaintiff's elevated CPK and/or LDH levels, including but not limited to stroke, cancer, heart attack, infection(s), tissue damage, or liver damage; to the extent Plaintiff did not undergo a muscle biopsy for his elevated CPK and LDH levels, this was not due to any failure to refer Plaintiff for same; rather, on March 17, 2021, Dr. Fogel (at KSB Hospital) recommended that Plaintiff first be referred to a rheumatologist or other specialist who could perform a muscle biopsy if indicated; Dr. Zahtz planned to order further testing before considering a rheumatology referral and possible muscle biopsy; NP Tuell subsequently submitted a referral for a muscle biopsy to Wexford, who then approved the referral request; however, when staff attempted to schedule the muscle biopsy, UIC advised that they would not/could not schedule Plaintiff for a muscle biopsy without a referral including a diagnosis and suggested an initial referral to a neurologist; and, once Plaintiff was seen by a neurologist, the neurologist did not recommend a muscle biopsy for Plaintiff. (*Id.* at ¶¶ 79, 80.)

### *The Declaration of Dr. Sy Concerning Plaintiff's Medical Care for his "Excessive Burping"*

Dr. Sy's declaration establishes that Plaintiff consistently tested negative for H. Pylori, underwent additional testing with a gastrointestinal specialist that was negative, and had periods where he reported his symptoms had resolved; and, to the extent Plaintiff experienced symptoms such as weakness and fatigue, and GI distress, these may be attributed to Plaintiff's morbid obesity and unhealthy lifestyle habits. (*Id.* at ¶ 81.)

### *The Declarations of Drs. Sy, Zahtz and Popovich Concerning Plaintiff's Medical Care for his Eye/Vision Issues*

As to Plaintiff's complaints about vision issues, Defendants' declarations establish that as the Dixon Medical Director, neither Dr. Sy nor Dr. Zahtz conducted eye exams of inmates; in the

27

event an inmate requires offsite optometry/ophthalmology care, Dr. Sy and Dr. Zahtz would review referral requests and subsequent offsite specialist recommendations provided to him by licensed optometrists/ophthalmologists; in Plaintiff's case, Dr. Sy and Dr. Zahtz always made such referrals on Plaintiff's behalf, and at no point withheld, denied, or caused Plaintiff to miss out on any medically necessary optometric care. (*Id.* at ¶ 82.)

***The Declarations of Drs. Sy, Zahtz and Popovich Concerning their Roles in Scheduling Off-Site Medical Appointments, Referrals, and Providing Prescriptive/Medical Devices***

According to these declarations, neither Dr. Sy, Dr. Zhatz, nor Dr. Popovich had any role in scheduling off-site medical appointments for inmates; a staff assistant in the medical unit handles the scheduling of off-site appointments, which are subject to the off-site provider's availability; further, Dr. Sy, Dr. Zahtz, and Dr. Popovich had no control over the availability of off-site medical providers; to the extent Plaintiff required any offsite care, Plaintiff was referred for such care in a timely manner as clinically indicated; Dr. Sy, Dr. Zahtz, and Dr. Popovich saw no evidence of any harm Plaintiff incurred by any perceived delay in attending any offsite appointments; Plaintiff was provided with appropriate and timely referrals to offsite providers to evaluate his various symptoms, including emergency care providers, rheumatologists, neurologists, ophthalmologists, ENT specialists, geneticists, physical therapists, and gastroenterologists; in no way did Dr. Sy, Dr. Zahtz, or Dr. Popovich delay Plaintiff's appointments with these providers, nor did he disregard the recommendations/plans set forth by those providers; to their knowledge, all the recommendations and plans set forth by Plaintiff's offsite providers were adopted in full by themselves and/or other Dixon medical staff; Plaintiff was provided with appropriate prescriptive/medical devices, including CPAP equipment and prescriptive eyewear, the prescriptions for which were modified as needed based on Plaintiff's measured visual acuity; Wexford never denied any requests for prescriptive/medical devices

28

which were ordered for Plaintiff and indicated as clinically necessary;  Wexford does not have any policies or practices to deny or delay inmate medical treatment, and Dr. Sy, Dr. Zahtz, and Dr. Popovich were not relying on any Wexford policy or guideline in treating Plaintiff;  Plaintiff was provided with timely and appropriate referrals for diagnostic testing to assess his reported symptoms, including blood pressure measurement, physical examinations, lab collections (including but not limited to labs to assess CPK, LDH, and H. Pylori bacteria), optometric examinations, diagnostic imaging studies (including MRIs, CT scans, X-rays, and ultrasound imaging), EKG studies, EMG studies, an EGD, genetic testing, and a gastric emptying study;  and, Plaintiff was provided with appropriate medications and treatment modalities to target his symptoms, as clinically indicated, including Simethicone, Clonidine, Hydralazine, Gabapentin, Nasacort, Claratin, Maxzide, Hytrin, Lopressor, Lisinopril, preservative-free artificial tears, Theratears, Zaditor, Pataday, Prednisolone Forte, Restasis, Prilosec, Robaxin, Keflex, Vaseline, Coreg, Nifedipine, pantoprazole, Erythromycin, Maxitrol, Omeprazole and Carafate.  (*Id.* at ¶¶ 83-86.)

### *The Declaration of Medical Records Clerk Cantu*

Defendant Cantu's declaration establishes that  at no time did Cantu refuse to schedule Plaintiff for any off-site medical appointments, nor did she cancel any off-site appointments that were arranged by other Dixon staff on Plaintiff's behalf;  she was unaware of any perceived delay in Plaintiff attending his appointments with off-site providers;  rather, Cantu would schedule any authorized off-site medical appointments once she received the authorization and knew which clinic would handle the appointment;  Cantu did not personally select the dates of Plaintiff's off-site appointments;  rather, Plaintiff's offsite medical providers scheduled his appointments based on their availability and provided the dates of those appointments to the prison staff;  Plaintiff's

referral for a muscle biopsy could not be scheduled because Plaintiff was not an established patient with a specialist who recommended, or would perform, the biopsy; at no point prior to this lawsuit was Cantu aware of grievances or letters Plaintiff wrote about her or directed to her; at no time did she retaliate against Plaintiff for filing any grievances or writing any letters; and, in her role as a medical records clerk, she was not personally involved in reviewing and responding to inmate grievances and complaints. (*Id.* at ¶¶ 87-89.)

### III.     Summary Judgment Standard

Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, reveals that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Smith v. Hope School*, 560 F.3d 694, 699 (7th Cir. 2009). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248 (1986); *see also Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000). In ruling on a motion for summary judgment, the court must consider the record as a whole, in the light most favorable to the non-moving party, and draw all reasonable inferences in favor of the non-moving party. *Anderson*, 477 U.S. at 255.

The parties seeking summary judgment have the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010). If the moving parties demonstrate the absence of a disputed issue of material fact, "the burden shifts to the non-moving party to provide evidence of specific facts creating a genuine dispute." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). The non-movant must go beyond the pleadings and "set forth specific facts showing there is a genuine issue for trial." *Hannemann v. Southern Door County School Dist.*, 673 F.3d 746, 751

(7th Cir. 2012).

## IV.     Discussion

As noted above, Plaintiff filed this case back in April 2023, alleging that Defendants Zahtz, Sy, Popovich, and Cantu were deliberately indifferent to his serious medical needs, that Wexford's various policies and procedures were the cause of the denials/delays with his medical care and treatment, and that Defendant Cantu retaliated against him for filing grievances and letters.  (*See* Dkt. 1, Plaintiff's complaint at pgs. 11-23.)  By order dated July 24, 2023, the Court found that Plaintiff's allegations were sufficient, at the pleading stage, to state an Eighth Amendment medical care claim (against Zahtz, Sy, Popovich, and Cantu), a *Monell* claim (against Wexford), and a First Amendment retaliation claim (against Cantu).  (Dkt. 7 at pgs. 2-3.)  At that time, Plaintiff was advised that his allegations were sufficient to proceed past the screening stage, but that he would eventually need to *prove* his allegations as the case progressed.  (*See id.* at pg. 3.)

Defendants now move for summary judgment, on the merits, in connection with each of the aforementioned claims.  (*See* Dkt. 95.)  However, in his memorandum of law, Plaintiff addresses *only* his Eighth Amendment medical deliberate claim against Defendants Drs. Zahtz, Sy, and Popovich;  he does not mention his Eighth Amendment medical deliberate claim against Cantu, his *Monell* claim against Wexford, and/or his First Amendment retaliation claim against Cantu.  (*See* Dkt. 117.)

In their Reply, Defendants argue that Plaintiff's failure to respond to their motion, as it pertains to the claims against Cantu and Wexford, constitutes waiver.  (*See* Dkt. 124 at pg. 13.)

It is unclear to the Court why Plaintiff did not attempt to respond to Defendants' motion as it concerns Cantu and Wexford.  ***After all, Plaintiff initiated this lawsuit and was explicitly advised by the Court in its July 24, 2023, screening order that he would eventually need to prove***

31

***his allegations as the case progresses***.  The Court is mindful of Plaintiff's statements in his motion to strike (*see* fn. 1 above) about having "difficulty" responding to Defendants' motion due to the length of their statement of facts.  But, the length of Defendants' summary judgment materials are not a valid reason (or excuse) for Plaintiff's lack of a response. Plaintiff cannot plead a plethora of alleged Constitutional violations and then bellyache when Defendants provide a treasure trove of evidence undermining his claims.  Nonetheless, in the interest of completeness, the Court assumes all of Plaintiff's claims are currently before it and addresses each of Plaintiff's claims below.

### A. Plaintiff's Eighth Amendment Medical Care Claim against the Individual Defendants

"The Eighth Amendment's prohibition on cruel and unusual punishment protects prisoners from prison conditions that cause the wanton and unnecessary infliction of pain, including grossly inadequate medical care." *Lockett v. Bonson*, 937 F.3d 1016, 1022 (7th Cir. 2019) (cleaned up). To prevail on a claim that his medical care violated the Eighth Amendment, the plaintiff must establish that: (1) he suffered from an objectively serious medical condition and (2) defendants were deliberately indifferent to that condition.  *See id.* at 1022 (citing *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011)).

The Court assumes, for purposes of this summary judgment order, that Plaintiff's elevated CPK and LDH levels, his eye/vision issues, and "excessive burping" constitute objectively serious medical conditions.  However, the claim fails on the deliberate indifference prong.

To be sure, deliberate indifference consists of more than negligence or malpractice; the defendant must know of and disregard an excessive risk to the prisoner's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The requisite culpable state of mind for deliberate indifference is akin to criminal recklessness.  *See, e.g., Cesal v. Moats*, 851 F.3d 714, 725 (7th Cir. 2017); *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012).

To prevail in a case like this (where the record is overwhelming *replete* with evidence showing that Plaintiff received regular care and treatment for his CPK and LDH levels, his eye/vision issues, and his "excessive burping"), the Court needs evidence that the treatment was "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment" in order to infer culpability. *Johnson v. Rimmer*, 936 F.3d 695, 707 (7th Cir. 2019) (quoting *Youngberg v. Romeo*, 457 U.S. 307, 323 (1982)).  In assessing a claim that a prisoner was subjected to treatment by medical professionals devoid of medical judgment, the Court should "look at the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to serious medical needs." *Riley v. Waterman*, 126 F.4th 1287, 1295 (7th Cir. 2025) (quoting *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (en banc)).

Here, there is *significant evidence* in the record, set forth above, showing that Plaintiff's medical providers, Drs. Zahtz, Sy, and Popovich, attended to Plaintiff's various health issues, monitored his medical conditions, and provided him with timely care and treatment for those conditions.  *See Walker v. Peters*, 863 F. Supp. 671, 673 (N.D. Ill. 1994) ("In summary, what the admissible evidence in the record shows overwhelmingly is a prisoner who does indeed suffer from a number of medical needs of a serious nature. . . but *all* of which have been the subject of constant medical attention.").

To be sure, the evidence shows that Dr. Zahtz first learned of Plaintiff's elevated CPK and LDH levels in or around November 2020.[5]  From that point up through 2021, Dr. Zahtz met

---

[5]   The Court understands Plaintiff's medical claim, as against Dr. Zahtz, to be related to his care/treatment for Plaintiff's elevated CPK and LDH levels, as the evidence in the record shows that Plaintiff's claims about "excessive burping" post-date Dr. Zahtz's employment at Dixon Correctional Center.  (*See* Dkt. 98 at ¶¶ 3, 36, showing that Dr. Zahtz left Dixon on March 29, 2022, and Plaintiff's issues regarding his "excessive burping" were not brought to the attention of medical staff until June 14, 2022.)  Likewise, there is no evidence in the record suggesting that Dr. Zahtz was directly involved in Plaintiff's medical care as it concerns his eye/vision issues, and Defendants have specifically introduced evidence showing that:  as the Dixon Medical Director, neither Dr. Sy nor Dr. Zahtz conducted eye exams

regularly with Plaintiff, monitored and assessed his CPK and LDH levels, and attempted to rule out possible causes for the elevated levels. Dr. Zahtz also specifically contemplated sending Plaintiff to a specialist *to consider* a possible muscle biopsy (although a muscle biopsy never ultimately occurred because *no specialist ended up ordering one*).

Similarly, Dr. Sy met regularly with Plaintiff in connection with his elevated CPK and LDH levels and his complaints of "excessive burping." Dr. Sy, like Dr. Zahtz, attempted to investigate the cause of Plaintiff's elevated labs, and also worked with Dixon medical staff to provide Plaintiff with medications to address his complaints of "excessive burping." Dr. Sy also ordered various lab tests and gastrointestinal studies to try and determine the cause of Plaintiff's "excessive burping."

The evidence related to Dr. Popovich paints a similar picture. Dr. Popovich met regularly with Plaintiff and provided Plaintiff with eye drops of various kinds to address Plaintiff's complaints of dry, itchy eyes -- medications that Plaintiff *admitted* were helpful and that were also recommended by Plaintiff's treating ophthalmologist at UIC. Dr. Popovich also provided Plaintiff with transition lenses and follow-up appointments for Plaintiff at UIC and actively monitored him for glaucoma.

On the extensive record before this Court, no reasonable jury conclude that Defendants acted with deliberate indifference to Plaintiff's elevated CPK and LDH levels, his eye/vision issues, and/or his "excessive burping." There is simply *nothing* in the lengthy sequence of care set forth above that suggests that the particular care and treatment decisions made by Plaintiff's

---

of inmates; in the event an inmate requires offsite optometry/ophthalmology care, Dr. Sy and Dr. Zahtz would review referral requests and subsequent offsite specialist recommendations provided to him by licensed optometrists/ophthalmologists; in Plaintiff's case, Dr. Sy and Dr. Zahtz always made such referrals on Plaintiff's behalf, and at no point withheld, denied, or caused Plaintiff to miss out on any medically necessary optometric care. (*See id.* at ¶ 82.)

34

medical providers were "so far afield of accepted professional standards as to raise the inference that [they] [were] not actually based on medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006); *see also Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008) (a medical professional is "entitled to deference in treatment decisions unless no minimally competent medical professional would have so responded under these circumstances").[6] Indeed, the evidence shows Plaintiff's claims are wholly without merit. *See Walker*, 863 F. Supp. at 673.

It is clear from Plaintiff's summary judgment response that he is dissatisfied with the provision of care he received for his elevated CPK and LDH levels, his eye/vision issues, and his "excessive burping." Despite the substantial evidence in the record showing he received regular care and treatment for the medical conditions at issue in this suit, Plaintiff maintains that Defendant Zahtz "intentionally ignored [his] serious medical needs" and "left [his] [elevated CPK and LDH] condition untreated." (Dkt. 117 at pg. 3.) He complains that Dr. Zahtz ignored his side pain, never ordered a muscle biopsy for him, and ignored the "risk" of his elevated CPK and LDL levels. (*Id.* at pgs. 4-5.) Plaintiff makes similar (generalized) statements with respect to Dr. Sy, complaining that Dr. Sy failed to order a muscle biopsy for him, failed to take additional steps to address his elevated CPK and LDH levels, failed to "conduct a test to see if [Plaintiff] [has] cancer[,]" and delayed sending him to a GI specialist in connection with his "excessive burping."

---

[6] Again, the Court reiterates that Plaintiff did not address his medical claim, as against Cantu, in his memorandum of law, such that it is unclear whether he intends to pursue this claim against her. Regardless, on a developed record, it is clear that Plaintiff cannot sustain a claim for medical deliberate indifference against her. As discussed above, Defendants have introduced evidence showing that: at no time did medical records clerk Cantu refuse to schedule Plaintiff for any off-site medical appointments, nor did she cancel any off-site appointments that were arranged by other Dixon staff on Plaintiff's behalf; she was unaware of any perceived delay in Plaintiff attending his appointments with off-site providers; rather, Cantu would schedule any authorized off-site medical appointments once she received the authorization and knew which clinic would handle the appointment; Cantu did not personally select the dates of Plaintiff's off-site appointments; rather, Plaintiff's offsite medical providers scheduled his appointments based on their availability and provided the dates of those appointments to the prison staff; Plaintiff's referral for a muscle biopsy could not be scheduled because Plaintiff was not an established patient with a specialist who recommended, or would perform, the biopsy. (*See* Dkt. 98 at ¶¶ 87-89.)

(*Id.* at pgs. 5-8.)  In a similar manner, Plaintiff states that Dr. Popovich "did not provide [him] with a standard of care" and that he "wrote [to] Dr. Popovich constantly" about his various eye issues. (*Id.* at pg. 9.)  Plaintiff avers that Dr. Popovich persisted in a course of treatment "[Dr. Popovich] knew did not work" and that he still suffers from ongoing eye problems, including eye pain.  (*Id.* at pg. 10.)

Plaintiff's broadly-worded conjecture is not sufficient to defeat summary judgment, *see generally Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 934 (7th Cir. 2021) (a party "must present more than mere speculation or conjecture to defeat  a summary judgment motion."); *see also Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (summary judgment is the "put up or shut up moment in a lawsuit"), and his statements are largely belied by the ***substantial evidence*** in the record (recounted above) showing that Drs. Zahtz, Sy, and Popovich were attentive to Plaintiff's evolving health needs over the course of a protracted period of time and that their medical decisions were reasonable and based on their clinical judgment.[7]

Ultimately, it may be that Plaintiff desired a particular form of care or treatment in connection with his various health issues (*and* at a certain time and place), but his personal preference, without more, is simply not enough to establish deliberate indifference.  *See Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010) (a prison medical provider is not deliberately indifferent simply because he offers a different course of treatment than the one requested by the

---

[7]  The Court notes that Plaintiff's summary judgment response is dense, difficult to follow, and is not specifically tailored to the arguments presented in Defendants' summary judgment motion.  That said, it appears that Plaintiff is complaining about perceived "delays" in his medical care.  Indeed, "'[a] delay in the provision of medical treatment for painful conditions . . . can support a deliberate indifference claim.'"  *Knight v. Wiseman*, 590 F.3d 458, 466 (7th Cir. 2009) (quoting *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008).  But to prevail on such a claim, a plaintiff must "introduce[] verifying medical evidence that shows his condition worsened because of the delay."  *Knight*, 590 F.3d at 466; *Williams v. Liefer*, 491 F.3d 710, 715 (7th Cir. 2007) (a plaintiff must "offer 'verifying medical evidence' that the delay (rather than the inmate's underlying condition) caused some degree of harm").  Even if the record suggested a delay in Plaintiff's medical care with respect to his various health issues (which it does not), Plaintiff would still need to come forward with evidence suggesting that his conditions worsened because of the delay.  He has not done so.

inmate); *see also Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012) (inmates are not entitled to "unqualified access to healthcare"); *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011) (inmates are not entitled to best care possible); *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997) (inmates have no right to demand specific treatment). Likewise, constitutionally adequate care does not require the total alleviation of pain and discomfort, as Plaintiff seems to expect or desire here. *See Garza v. Wexford Health Sources, Inc.*, No. 19-2321, 2022 WL 3443775, at *10 (C.D. Ill. July 18, 2022) (citing *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996) ("To say the Eighth Amendment requires prison doctors to keep an inmate pain-free in the aftermath of proper medical treatment would be absurd.").

Accordingly, for the reasons discussed above, the Court finds that the individual Defendants are entitled to summary judgment on Plaintiff's Eighth Amendment medical deliberate indifference claim.

### B. Plaintiff's *Monell* Claim against Wexford

With respect to Plaintiff's *Monell* claim, Plaintiff has not shown a constitutional problem with his medical care (for the reasons discussed above), nor has he shown any evidence that that he was injured due to an institutional policy. In such circumstances, there is no municipal liability. *See Johnson v. Prentice*, 29 F.4th 895, 905 (7th Cir. 2022) (dismissing *Monell* claim that "suffer[ed] from two deficiencies: there is no proof of an underlying constitutional violation by any individual Wexford defendant nor any evidence that an institutional policy caused such a violation.").

Accordingly, Defendant Wexford is entitled to summary judgment on Plaintiff's *Monell* claim.

### C. Plaintiff's Retaliation Claim against Defendant Cantu

This leaves Plaintiff's retaliation claim against Defendant Cantu. At the summary judgment stage of a retaliation action, a plaintiff must present evidence permitting a reasonable jury to conclude that: (1) he engaged in activity protected under the First Amendment; (2) he suffered a deprivation that would likely deter future First Amendment activity; and (3) his First Amendment activity was at least a motivating factor in Defendants' decisions. *See Perez v. Fenoglio,* 792 F.3d 768, 783 (7th Cir. 2015) (citing *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009)).

Plaintiff's retaliation claim cannot proceed at the summary judgment phase. Defendants have introduced evidence specifically showing that: at no point prior to this lawsuit was Defendant Cantu aware of grievances or letters Plaintiff wrote about her or directed to her; at no time did she retaliate against Plaintiff for filing any grievances or writing any letters; and, in her role as a medical records clerk, she was not personally involved in reviewing and responding to inmate grievances and complaints. Notably, Plaintiff himself admitted at his deposition that he had no knowledge whether Defendant saw any letters or grievances he submitted (*see* Dkt. 98-1 at 67:12-15; 68:2-5), and, as discussed above, he ***does not address this claim at all*** in his summary judgment response.

Accordingly, Defendant Cantu is entitled to summary judgment on Plaintiff's retaliation claim.

## V. Conclusion

Plaintiff's motion to strike (Dkt. 125) is denied. Defendants' motion for summary judgment (Dkt. 96) is granted. If Plaintiff wishes to appeal, he must file a notice of appeal with this Court within thirty days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1). If Plaintiff

seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* in this Court. *See* Fed. R. App. P. 24(a)(1). Final judgment shall enter. Civil case closed.

Date: July 13, 2026            By: _____

Iain D. Johnston
United States District Judge

39